(45 South. 928.)

No. 16,822.

Succession of NEWMAN.

(Jan. 20, 1908. Rehearing Denied March 16, 1908.)

APPEAL—REVIEW—CONFLICTING EVIDENCE.

Where the evidence as to sanity vel non of a testator is conflicting, and does not clearly preponderate in favor of the theory of insanity, the conclusions of the trial judge on the facts will not be disturbed.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 3, Appeal and Error, §§ 3983–3989.]

(Syllabus by the Court.)

Appeal from Civil District Court, Parish of Orleans; Walter Byers Sommerville, Judge.

In the matter of the succession of Thomas Newman. From an order dismissing oppositions to the probate of his will, the opponents appeal. Affirmed.

Joel Jones Prowell and Dinkelspiel, Hart & Davey, for appellants. Edward Rightor and Arthur Landry, for appellees.

LAND, J. Thomas Newman, about 80 years of age, died in the city of New Orleans on May 27, 1907. His three daughters presented for probate an olographic will purporting to have been made by the deceased on October 1, 1904. Two sons of the deceased opposed the probate and execution of the testament on the ground that the testator was at the time mentally incapable of making his last will.

On the trial it was proven that the testament was wholly written, dated, and signed in the handwriting of the testator. Many witnesses were examined on the question of sanity vel non of the decedent at the time of the making of the testament. The judge a quo, after carefully considering all the evidence adduced, as shown by his written opinion, rendered judgment dismissing the oppositions, admitting the will to probate, and ordering its registry and execution. Opponents have appealed.

The testament, entirely in the handwriting of the testator, bears date October 1, 1904. It was written in the office and presence of a reputable member of the bar, who had been attorney of the decedent for a number of years, and who had on two former occasions furnished him with forms for drafting an olographic will. The last of prior

wills made in 1902 divided the estate equally among the children of the testator, and appointed the attorney as executor. By the will of October 1, 1904, one-third, or the disposable portion of the estate, was bequeathed as an extra portion to the three daughters, and the residuum left to the sons and daughters, to be divided share and share alike. The testator declared in this will that he was indebted unto his widowed daughter, Mrs. Shelly, in the sum of $5,000 for money borrowed, and appointed Mrs. Shelly as executor without bond. The attorney testified that the testator declared what dispositions he desired to make of his estate, and what person he wished to appoint to execute the provisions of the will. The attorney further testified that he, at the request of the testator, furnished the form of the will by dictation. Undue influence is not alleged, nor formal defects in the execution of the testament. Opponents assail the will on the sole ground of insanity. As it cannot be said that the will sounds in folly, the burden of proving insanity at the time rests on the opponents. It is conceded that the testator became insane on or about January 17, 1905, and was subsequently interdicted. His previous mental condition is a subject on which much conflicting evidence was adduced on the trial below. The decedent, although old, was a man of vigorous health, and the record does not show that he was attended or examined by any physician prior to January 17, 1905. Hence the absence of expert evidence as to his previous mental condition.

Thomas Newman was the originator of a horse car line of railway on St. Charles street, and from the beginning occupied the position of foreman or superintendent, and as such purchased and cared for the mules that furnished the motive power. After the substitution of electric motive power, Newman was retained as foreman, but his duties and powers were curtailed. In the year, 1901, Newman, then about 74 years of age resigned his position. While the company did not discharge Newman on account of his long connection with the line, which had been called for many years, "the Newman Road," the management considered that Newman's ideas were old fashioned and not up to the time, and desired to get rid of him. Newman, finding that his duties and powers were being curtailed and that he was being treated in the light of a pensioner, resigned his position.

Newman's wife died in 1889, and in 1890 he purchased the interest of his children in her estate. He owned a number of cottages, and resided in one of them with his widowed daughter, Mrs. Shelly, and his unmarried daughter, Honora. Mrs. Shelly collected the rents due her father, and looked after his leased properties. The two sons were married, and were engaged in business for themselves in the city of New Orleans. Neither of them, prior to the year 1907, seemed to have concerned themselves about their father's condition, or the management or disposition of his property. They protested, in 1907, ignorance of the fact that their father during the years 1902 and 1903 had sold several pieces of real estate, as shown by the public records. This unconcern manifested either indifference to the mental condition of the father, or the belief that his condition did not warrant any supervision of his person or affairs.

Thomas Newman was blessed with an unusually strong and vigorous constitution, which had never been impaired by dissipation or even indulgence in the smaller vices. In January, 1905, Thomas Newman was taken violently ill, suffering from intense pain, and physicians were summoned to attend him. It was, however, not until April 1, 1907, that his sons petitioned for the interdiction of their father. The medical experts

reported that Thomas Newman was suffering from senile dementia. One of the experts had attended Newman when he was stricken in January, 1905, and testified in part as follows:

"Q. Do you know when his conditions commenced?
"A. I saw him first when he had the intense pain, and I never could get anything from him as his statements were not clear to me."

In the absence of expert opinion, the question whether Thomas Newman was insane on October 1, 1904, must be answered on the conflicting evidence of laymen. It is admitted that Newman was harmlessly insane from and after January 17, 1905. The three first witnesses who were called to prove the will were examined as to the sanity of the testator. The first, an old acquaintance, testified that the testator's mind was all right prior to the year 1905. The second, a daughter of the testator, testified that her father was sound in mind and body prior to his illness on January 17, 1905. The third, the attorney who furnished the form of the will, and who had advised the decedent for a number of years, testified that he had never seen any act of Newman indicating insanity prior to said illness.

The testimony of the witnesses for the opponents is in the main too uncertain to throw any great light on the question of sanity vel non on October 1, 1904. Mr. Graham said that Newman was regarded as "simple," but cannot fix dates. Mr. Phelps thought that Newman in 1901 was getting a little bit too old and was rather in his dotage. About one year thereafter Newman insisted that he had not resigned, but had been discharged. Mr. Phelps admits that he gave no thought to Newman's mental condition until long afterwards when certain things happened which made him think that Newman was a little peculiar. Mr. Craig testified that Newman would talk foolish once in a while, that he would say that he was going to buy mules, that the electric cars were going to turn into street cars, and that he was going back to work for the railroad company again. Mr. Hoffman's testimony is that prior to Newman's illness he talked about mules, and at one time about doctoring a mule; that sometimes Newman would say something wrong as old men do, and "sometimes he would talk as good as any man living." Mr. Knickerbocker, who lived under the same roof with the deceased in 1903 or 1904, said:

"Well, Mr. Newman was a very old man, of course, and I don't suppose that his intellect was as good as it was in his younger days. In fact I know it was not as good at that time as it was when I first knew him. He was a little childish, in other words * * * he was not in full possession of all of his faculties. Of course, I don't mean by that to say he was insane."

Mr. Biaggne said that he had noticed a great change in Newman in 12 years; that before Newman's illness he would walk up and down the banquette about noontime with his hat off; that the witness could get no sensible conversation out of him; it was either a mule or horse he would speak about, and he would go through the neighborhood looking for his horse; that 12 years ago Newman would know the witness, but 4 years ago he would not. Mrs. Biaggne testified that, 3 or 3½ years before the trial, Newman pushed her gate open, shoved the witness violently aside, and declared his intention to go into the back yard; that, instead of going into his own house, Newman went next door, and entered the room of a lady who was just getting out of bed; that on another occasion Newman got on her front gallery, knocked his head on the glass, and made funny motions with his hands; and that Newman one evening when the Carondelet car was passing said to her, "What in the hell the car is running for?" The story of this lady is not corroborated, though the first incident must have been known to several persons. Mr. McGreevy, a street car conductor, testified that about five years before the trial (say in

120 LOUISIANA REPORTS. ·

1902) Newman while in a car spoke of the "new boss—the man who owned all the teams" when in fact the road had the same boss; that on another occasion, about three years before the trial, Newman stopped a whole string of cars on Howard avenue and Baronne, claiming that he was the boss, and telling the employés what to do. There is no corroboration of this testimony.

Judge Conner's testimony is so uncertain as to date that it need not be repeated. In one of his answers the witness says:

"I did not have much to say to him before the fire, only 'Good morning,' or 'Good evening,' that was about all."

The "fire" refers to the burning of the Athenaeum, which occurred about January 15, 1905, and Newman was stricken down with illness two days later. William T. Cotter, an employé of William Newman in his blacksmith shop, is one of the principal witnesses for the opponents. The first incident related by this witness is timed in 1902, while Thomas Newman was living on Carrollton avenue. Newman was a horse doctor, and made an appointment with Cotter to visit the suburbs for the purpose presumably of treating some animal of the horse kind. Cotter in his testimony in the interdiction suit gave the following version of the incident:

"One Sunday morning he said, 'Have you tools ready,' and he says, 'You don't have to pay car fare,' he says, 'I'll pay it.' We got (out) near Broad street, and I said, 'Where are you going to?' I says to the old man, 'Let's go back and go in the car,' and he didn't know where he lived. I seen him back home."

In the instant case, Cotter testified that the old man said that it was ·not necessary to pay fare as he owned the line; that he (Cotter) paid the fare; that they got off at Hagan avenue; that the old man walked him about four miles, and he got very tired of walking; that both turned and walked to Tulane avenue and took a car, and the old man got out by his house; that he (Cotter) put him off at the corner. The statements in

the two versions are entirely different as to what Thomas Newman said about paying the car fare. The first statement is that of a sensible man. The second is that of a person laboring under an insane delusion. There are other differences between the two stories that are apparent. Cotter also gave two versions of what may be called the "race track incident." In the first, Cotter said:

"About four years ago he brought me to the race track one day. I was working for his son; his son catch me on the race track the next day, and he gave me sand."

In the new version Cotter and the old man visited the race track, and were there met by the son who ordered Cotter to take the old man home. Cotter says on cross-examination that the old man told him to borrow $10 from a stranger, so he could bet on his son's horse. This last statement is matter which does not appear in the first version. On both trials Cotter stated that the old man had accused him of stealing his mules and his watch. The latter accusation was made in 1905. Cotter · says that the former was made in 1904, and that Newman owned no mules at the time.

Mr. King, brother-in-law of William Newman, testified that about four or five years before the trial (1902 or 1903) he noticed that Thomas Newman was losing his mind, and becoming very childish; that on one occasion Newman had forgotten the street he lived on; that Newman would talk very sensibly for a few minutes on the subject of mules, and then would say, "Well, I have to go to attend to my business, and look after my mules," or something of the sort; and that Newman had no business and no mules. Edward Newman testified that his father about six or seven years before the trial (1901 or 1900) became very forgetful, would talk on subjects that did not concern him, would ask the witness to get him a job on the road, and, from these and other things, the witness knew that his father's mind was

very bad. Edward Newman further testified that he had no knowledge of the sales of real estate made by his father in 1902 and 1903, that the proceeds of these sales and the rents went into the possession of his sister Mrs. Shelly, that his father had no occasion to borrow money of any one, and that nothing but the kindest feelings had ever existed between him and his parent. It appears from the testimony of Edward Newman that his father had left a policy of life insurance for $3,000 in favor of his three sisters, and in that or some other policy had stated that he was aged 65 years, when he was in fact at the time 75 years old. William Newman detailed at length the facts and circumstances which induced him to believe that his father was insane. The first is that Thomas Newman, while foreman of the street car company, took his knife and cut off two or three of his toes which had been nearly mashed off by the fall of some heavy castings.

Next, the father in treating a mule's foot applied pure nitric acid which would have eaten up the foot in five minutes if witness had not removed the bandage. The third was the incident of the father's taking Cotter to the race track, which has already been mentioned. The witness very naturally and properly objected to Cotter's leaving his work and taking a holiday.

The father came to the son's shop nearly every day, and the burden of his talk is set forth by the witness as follows:

"He said that he was on his way to Colonel Sullivan's office, that Colonel Sullivan was going to get a job for him, because he couldn't stand this life of idleness. Then he would say that he was going to buy some furniture wagons and teams, and I told him not to do anything of that kind, because labor was to hard to get, and it wouldn't do for him to be in that line of business."

William Newman further stated that the entire family knew the condition of the father's mind was bad; that the interdiction proceedings were not brought sooner because

he thought that his father and his property were being cared for in a proper manner, and did not think otherwise until Mr. Landry was appointed agent. The witness confirms his brother's testimony as to the kindly relations which existed between the father and his sons, and says that there was no reason for the father's giving the disposable portion to his daughters and five thousand dollars to one of them. In the opinion of the witness, the will was dictated by outsiders, and as to his father's mental capacity, said:

"I should say that the condition of his mind was bad. I would not say that he was insane, but he was aged and feeble, and didn't know what he was talking about."

The witness testified that his sisters knew that the father was unbalanced in mind. The witness, like his brother Edward, knew nothing of the sales of property by their father, of the insurance on his life in favor of the sisters, of any claim of indebtedness due by him to Mrs. Shelly, or of the existence of the will of 1904, until some time during the year 1907. William Newman admitted on cross-examination that he had testified in the interdiction proceedings of 1907 that Thomas Newman was taken sick about the time of the Athenaeum fire of January, 1905, and that on that occasion he swore that he could not recollect that his father had done anything before that time a sane man would not do. The witness in the instant case explained that he was sick on the former occasion, and that his memory had been refreshed. In justice to the witness we give the questions and answers on the former trial, to wit:

"Q. Don't you know that prior to that time his mind was absolutely good?
"A. No; I don't think it was. I told my sisters that his mind was getting affected.
"Q. Did he go round looking for mules before that time?
"A. Not that I know of.
"Q. Can you say that he did anything before that time that a sane man would not do?
"A. Not that I can recollect now."

The uncertainty of memory as to dates is shown by the circumstances that this witness made a mistake of several years as to date of the Athenaeum fire, an event then scarcely 18 months old.

The material evidence in rebuttal is as follows: E. B. McKinney, chief mechanical engineer of the street railway company, knew Thomas Newman since 1895. Met him often during his later years, and in the spring of 1904 had a somewhat lengthy conversation with him. The witness had no reasons to believe from Newman's remarks that he was not in his right mind, and perceived no change in his previous mental condition.

Lawrence Fabacher was well acquainted with Thomas Newman, and employed him in the fall of 1904 as veterinary surgeon to treat a fine horse which had become foundered. Newman treated the horse, and though he did not entirely cure him, the condition of the animal was greatly improved. Mr. Fabacher conversed with Newman while he was treating the horse, and found nothing in his mode of treatment, actions, or speech to indicate an unbalanced mind. Newman was paid $20 for services in October, 1904. Patrick McGrath, was a cousin of Thomas Newman, and was intimate with him. Found Newman's mental condition good in 1904, and even after the illness of January, 1905, discovered no indications of insanity in his actions or speech. Thomas B. Cleary knew Thomas Newman when the latter lived in Carrollton avenue and saw him quite frequently. Had no reason to question his mental condition, which seemed to be of the average. Had not noticed any change in Newman's condition within the last two years preceding the trial. Gus Oertling, secretary of the Jackson Brewing Company, confirms Fabacher's testimony of Newman's treatment of the horse in 1904. This witness fixes the date as in September, and states that the treatment lasted several weeks. Newman's bill was paid on October 29, 1904. The witness had known Newman for many years, and had several conversations with him while the horse was being treated. There was nothing the matter with Newman that the witness could perceive. Ed. Moore, a carriage driver, was well acquainted with Thomas Newman. The witness never saw Newman after his illness in January, 1905. Newman's condition previously is described by the witness as "only a little childish," but at times he would talk very sensibly. The childishness consisted in saying the same thing over and over again. The witness further states that Newman was sensible and did not show that his mind was wrong. Newman talked with the witness on ordinary topics which are detailed in the evidence. On one occasion the witness employed Newman to treat one of his horses.

The judge a quo after a careful review of all the evidence reached the conclusion that the testimony adduced was insufficient to prove the insanity of Thomas Newman on October 1, 1904. The opinion of a layman as to the sanity vel non of a particular person is worth nothing unless based on facts sufficient to indicate mental condition at a particular time. In this case dates are all-important, as it is conceded that Thomas Newman became insane after his sudden illness in January, 1905. On the trial of the interdiction suit William Newman could not recall any acts of his father savoring of insanity prior to January, 1905. Doubtless, the two sons and several of their witnesses testify to prior acts and conduct of the testator which indicate an unbalanced mind. But there is much evidence tending to show the contrary, notably the testimony of the attorney who furnished Thomas Newman with the forms of three wills, and who for a number of years advised him in other matters. It appears from the attorney's testimony that Thomas Newman had sense enough to instruct his attorney as to what disposition he desired to make of his estate,

BAILEY v. JANVIER.

and mental faculties sufficiently under his control to write his will correctly. The evidence shows beyond question that shortly before the date of the will Thomas Newman was intelligently pursuing his vocation of horse doctor, to the satisfaction of his employer, and without the manifestation of any mental aberration. To reconcile all of the conflicting evidence in the case is an impossible task. Much of the conflict may be ascribed to confusion of dates, and a great deal of the testimony may be reconciled on the theory that Thomas Newman's mental condition was not the same at all times.

However this may be, we do not find that preponderance of the evidence which would justify us in reversing the conclusions of our learned Brother of the district court on questions purely of fact. The presumption of law is in favor of sanity.

Judgment affirmed.